**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL MULCH AND SEED, INC., et al., | : | |
| | : | **Case No. 2:02-cv-1288** |
| **Plaintiffs,** | : | |
| | : | **Judge Holschuh** |
| **v.** | : | |
| | : | **Magistrate Judge Kemp** |
| REXIUS FOREST BY-PRODUCTS INC., d/b/a REXIUS EXPRESS BLOWERS, | : | |
| | : | |
| **Defendant.** | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, National Mulch and Seed, Inc., ("National Mulch"),[1] brought this action alleging that certain trucks purchased from Defendant Rexius Forest By-Products, Inc., ("Rexius"), failed to perform as promised. Specifically, National Mulch asserts claims of breach of express warranty, negligent misrepresentation, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. This matter is before the Court on Rexius's three motions for partial summary judgment (R. at 73, 75, 88), on National Mulch's motion for partial summary judgment (R. at 87), and on Rexius's objection to certain evidence submitted by National Mulch. (R. at 92.)

**I. Background**

In the middle to late part of 1999, Richard Fischer and Montford Will began discussing the possibility of starting a mulching and landscaping business. (Fischer Decl. ¶ 4, Feb. 13, 2006; Fischer Dep. 13-16.) After obtaining information regarding a similar business operated by Fischer's

---

[1] On December 8, 2004, Central Ohio Topsoil and Mulch, Inc., voluntarily dismissed its claims against Defendant with prejudice. (R. at 61.)

brother in Florida, Fischer and Will developed a business plan for the creation and operation of National Mulch in Ohio.  (Fischer Dep. 13-30; Will Dep. 18-37.)  Pursuant to this business plan, National Mulch contacted Rexius in November 1999 regarding the possibility of purchasing mulch-blowing trucks to be used in its mulching and landscaping business.  (Fischer Decl. ¶ 5, Feb. 13, 2006.)

National Mulch contends that during negotiations regarding the purchase of Rexius's Express Blower 60 mulch-blowing trucks ("Express Blower," "EB-60," or "truck"), Rexius made various oral and written representations regarding the trucks' productivity, capability, and reliability. In particular, National Mulch alleges that Rexius made the following representations:

1. An Express Blower, using only one person, can blow 55 cubic yards per hour.

2. The Rexius Express Blower can be used effectively by only one person.

3. The Express Blower is trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high-quality material and workmanship.

4. The maintenance cost for the Rexius Express Blower is minimal.

5. As to National Mulch, the Rexius Express Blower would effectively die [sic] mulch.

(Fischer Decl. ¶ 6, Feb. 13, 2006; Compl. ¶ 7.)

National Mulch contends that the representations made by Rexius induced it to purchase the mulch-blowing trucks from Rexius.  (Fischer Decl. ¶¶ 4-7, Feb. 13, 2006.)  National Mulch personnel, including Fischer, traveled to Oregon in late March 2000 to observe Rexius's plant and receive training on the operation of the trucks.  (Fax from Rick Fischer to Denny Drennan (Mar. 19, 2000), Def.'s Mot. Part. Summ. J. Certain Claimed Damages Ex. 9.)  On April 3, 2000, National

2

Mulch agreed to purchase its first EB-60 truck.  (<u>See</u> Fischer Dep. 152-53.)  While in Oregon, Fischer, on behalf of National Mulch, and Denny Drennan, on behalf of Rexius, signed a "Sales Quote" setting forth various terms and conditions of the sale.  (Fischer Dep. 137-38; Sales Quote, Apr. 3, 2000, O'Neil Decl. Ex. 4, Mar. 16, 2006.)  The Sales Quote is two pages in length with the second page appearing on the reverse side of the first.  (Fischer Dep. 137; Sales Quote, Apr. 3, 2000.)  The first page includes the quantity, description, and price of the goods sold; the names and addresses of the parties; the signatures of Fischer and Drennan; and an indication at the bottom noting that there are terms and conditions of the agreement contained on the reverse side.  (Sales Quote, Apr. 3, 2000.)  The reverse side lists thirteen "ADDITIONAL TERMS AND CONDITIONS OF SALE."  (<u>Id.</u>)

Later, National Mulch agreed to purchase a second EB-60 truck.  (Fischer Decl. ¶ 3, Feb. 13, 2006.)  Rexius faxed a Sales Quote for this second truck, signed by Drennan, to National Mulch on May 20, 2000.  (Fax from Denny Drennan to Rick Fischer (May 20, 2000), Def.'s Mot. Part. Summ. J. Certain Claimed Damages Ex. 59.)  Although a copy of a Sales Quote signed by both parties with respect to the second purchase does not appear in the record, Fischer understood that the terms of the second sale and the forms used therewith were identical as National Mulch's first purchase. (Fischer Dep. 152-53.)  Rexius appears to concur that the terms of the second sale were the same as the first.[2]

---

[2] The Court notes that National Mulch has repeatedly stated that it purchased its first EB-60 truck "on or about Jan. 11, 2000, and a second vehicle on April 4, 2000."  (<u>E.g.</u>, Pl.'s Mem. Contra Def's Mot. Partial Summ. J. Certain Claimed Damages 2 (citing Fischer Decl. ¶ 3, Feb. 13, 2006); Fischer Decl. ¶¶ 38-39, Feb. 13, 2006.)  Even viewing the evidence before the Court in a light most favorable to National Mulch, the record cannot support this purported time line. National Mulch initially considered purchasing a model EB-90 truck.  (Fischer Decl. ¶ 10, Feb.

navigation(continued...)

3

National Mulch claims that the EB-60 trucks failed to meet the representations made by Rexius. Specifically, National Mulch contends that the EB-60 trucks could not blow 55 cubic yards of mulch per hour on most jobs, that it could not effectively operate an EB-60 truck with only one person, that the EB-60 trucks could not effectively dye mulch, and that the EB-60 trucks suffered various mechanical problems. (Fischer Decl. ¶ 14, Feb. 13, 2000.) National Mulch contends that this lack of productivity and reliability caused a loss of profits and ultimately caused it to go out of business. (Id. at ¶ 15-23.)

## II. Rexius's Objections to Evidence

Rexius has objected to certain evidence submitted by National Mulch. In support of its motion for partial summary judgment, National Mulch submitted the declarations of several other purchasers of mulch-blowing trucks from Rexius. Rexius argues that this evidence is not relevant at this stage of the litigation and, alternatively, that the probative value of such evidence is substantially outweighed by the risk of unfair prejudice.

---

[2](...continued)
13, 2006.) On January 11, 2000, Rexius faxed a Sales Quote for a model EB-90 truck to National Mulch. (Sales Quote, Jan. 11, 2000, Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 14.) This Sales Quote was signed by Rick Fischer (see id.), but the record does not reflect whether or not it was returned to Rexius. Regardless, as the January Sales Quote pertains to an EB-90, and neither party has ever claimed that National Mulch purchased this model, it does not appear that National Mulch purchased a truck from Rexius in January 2000.

Instead, subsequent to receiving the Sales Quote for the EB-90, National Mulch decided to purchase a model EB-60 truck. Rexius says that it prepared the April 3, 2000 Sales Quote in conjunction with National Mulch's first EB-60 purchase and that both parties signed this Sales Quote the same day. Fischer admits that he signed this Sale Quote in Oregon. (Fischer Dep. 137-38.) Additionally, Fischer's testimony shows that the April purchase was National Mulch's first EB-60 purchase and that the second purchase came later that spring. During his deposition, Fischer agreed that National Mulch had owned its first truck for "a month, month and a half" at the time that it received the May 20, 2000 Sale Quote. (Id. at 152-53.)

4

National Mulch contends that the purpose of the disputed evidence is to support its claim that certain representations made by Rexius constitute express warranties. Rexius, however, does not deny that certain representations were made in connection with the sale of the EB-60 trucks to National Mulch and, as will be made clear infra, this Court has not relied upon this disputed evidence in resolving National Mulch's motion for partial summary judgment, nor any other dispositive motion. Rexius's objection is therefore moot.

### III. Motions for Partial Summary Judgment

#### A. Standard

The parties have filed multiple motions for partial summary judgment. Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broad. Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Ark. Natural Gas Corp., 321 U.S. 620, 627 (1944); see also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48.  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984); see also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine"

6

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248; see also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and it "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Cos., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, 39 F.3d at 1347.

### B.  Choice of Law

A federal court exercising diversity jurisdiction is required to apply the choice of law rules of the state in which it sits.  Int'l Ins. Co. v. Stonewall Ins. Co., 86 F.3d 601, 604 (6th Cir. 1996). Accordingly, Ohio's choice of law rules apply in this diversity case.  In Ohio, the rights and duties of parties to a contract are determined by the law of the state that has "the most significant relationship to the transaction and the parties."  Ohayon v. Safeco Ins. Co. of Ill., 91 Ohio St. 3d 474, 477 (2001) (quoting Restatement (Second) of Conflict of Laws § 188(1)).

National Mulch is a corporation organized under the laws of Ohio with its principal place of business in Ohio.  (Compl. ¶ 2.)  Rexius is an Oregon corporation with its principal place of business in Oregon.  (Notice Removal ¶ 2.)  Although a conflict between Ohio law and the law of Oregon could possibly exist, neither party has identified any relevant conflict.  Moreover, both National Mulch and Rexius have consistently relied upon Ohio law in their memoranda since this action's inception.  Consequently, the Court need not engage in a choice of law analysis at this point, but will simply apply Ohio law.   See Wilkes Assocs. v. Hollander Indus. Corp., 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (citing ECHO, Inc. v. Whitson Co., 52 F.3d 702, 707 (7th Cir. 1995) ("Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.")).  In any event, the parties appear to agree that Ohio law applies to the claims asserted in this case.

### C.  Negligent Misrepresentation Claim

In Count II of the Complaint, National Mulch asserts a claim for negligent misrepresentation. The Supreme Court of Ohio first recognized this cause of action in Haddon View Investment Co. v. Coopers & Lybrand, 70 Ohio St. 2d 154, 156 & n.1 (1988).  Adopting the Restatement (Second)

of Torts § 552, the Supreme Court of Ohio has defined a claim for negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. City of Cleveland Heights, 41 Ohio St. 3d 1, 4 (1989) (quotations, citations and emphasis omitted).

As a basis for its claim, National Mulch alleges that Rexius made the following representations:

a. The Rexius Express Blower, using only one person, can blow 55 cubic yards per hour.

b. The Rexius Express Blower could be used effectively by only one person.

c. The Rexius Express Blower was trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high quality material and workmanship.

d. The maintenance cost for the Rexius Express Blower was minimal.

e. As to National Mulch, the die [sic] feature of the Rexius Express Blower would effectively die [sic] mulch.

(Compl. ¶ 14.)  Rexius has moved for summary judgment arguing that National Mulch's negligent misrepresentation claim is without merit because: (1) it is barred by the economic loss rule, (2) National Mulch has failed to establish the existence of a special relationship between itself and Rexius, and (3) National Mulch's claim is impermissibly based, at least in part, on omissions of fact.

### 1. Economic Loss Rule

The economic loss rule generally prevents recovery of damages for purely economic loss in connection with a tort claim.  Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St. 3d 412, 414 (2005); Floor Craft Floor Coverings, Inc. v. Parma Cmty. Gen. Hosp. Ass'n, 54 Ohio St. 3d 1, 3 (1990).  The Supreme Court of Ohio explained the reasoning behind the economic loss rule:

> The reason for denying recovery in negligence for purely economic loss lies not in a failure to find "negligent" conduct by the manufacturer, nor in a lack of proximate relationship between that conduct and the consumer's injury.  Rather, the key factor is the extent, and more important, the source, of the duty owed by the manufacturer to the consumer.  In negligence, the law imposes upon the manufacturer of a product the duty of reasonable care.  That duty protects the consumer from physical injury, whether to person or property.  However the law of negligence does not extend the manufacturer's duty so far as to protect the consumer's economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties.

Chemtrol Adhesives, Inc. v. Am. Mfgs. Mut. Ins. Co., 42 Ohio St. 3d 40, 45 (1989).  The court later expounded upon this rationale by explaining that "[t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." Floor Craft, 54 Ohio St. 3d at 7.  Rexius argues that, under the economic loss rule, National Mulch cannot maintain a negligent representation action because economic losses are not recoverable in tort between commercial entities that have contracted with each other.

Before deciding whether the economic loss rule applies, the Court must first determine the nature of the alleged losses resulting from Rexius's alleged negligent misrepresentation.  Damages are generally characterized as either personal injury, property damage, or economic loss. E.g., HDM Flugservice GMBH v. Parker Hannifin Corp., 332 F.3d 1025, 1028 (6th Cir. 2003); Chemtrol, 42 Ohio St. 3d at 43.  "Personal injury" involves, quite obviously, injury done to one's person.  In an action involving the sale of goods, "property damage" includes damages to both the goods sold to

the plaintiff and other property of the plaintiff. E.g., Chemtrol, 42 Ohio St. 3d at 43. "Economic loss" includes both direct and indirect loss. Id. "Direct" economic loss includes the loss attributable to the decreased value of the product itself.[3] "Indirect" economic loss includes the consequential losses sustained by the purchaser and can include items such as loss of time and profits. Id. at 44.

National Mulch alleges that reliance upon misrepresentations made by Rexius caused the complete failure of its business. Precisely, National Mulch claims that it incurred damages in the form of substantial additional costs because the Rexius trucks did not perform as represented. These costs included, inter alia, expenses for repairs, tools, labor, interest, insurance, general maintenance, and the expense of purchasing the trucks themselves. (See Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 3; see also Fischer Decl. ¶¶ 27-32, Feb. 13, 2006.) All of the damages claimed by National Mulch are properly characterized as economic losses because they either relate to the value of the trucks or additional expenses, i.e., lost profits, incurred as a consequence to relying upon Rexius's alleged misrepresentations. As such, National Mulch's claim is without merit if the economic loss rule applies to the tort of negligent misrepresentation.

The Supreme Court of Ohio has yet to specifically address the economic loss rule in the context of a claim for negligent misrepresentation; however, several Ohio appellate courts have done so.[4] A majority of these courts have recognized that a claim for negligent misrepresentation is actionable even when the plaintiff's damages consist only of economic loss. E.g., Universal

---

[3] Direct loss is normally measured by the difference in value of a defective product and that product's value had it not been defective. E.g., Chemtrol, 42 Ohio St. 3d at 43.

[4] In diversity cases, federal courts must apply state law in accordance with controlling decisions of the highest state court, or, if the state's highest court has not spoken on a precise issue, on decisions of the state's lower courts. E.g., Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 517 (6th Cir. 2001); see generally Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

Contracting Corp. v. Aug, No. C-030719, 2004 WL 3015325, at *3 (Ohio App. 1st Dist. Dec. 30, 2004); Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co., 121 Ohio App. 3d 434, 440-41 (1997); McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc., 87 Ohio App. 3d 613, 631-32 (1993).  In McCarthy, Lebit, the court reasoned that application of the economic loss rule to a negligent misrepresentation claim directly contradicts the express wording of the cause of action of negligent misrepresentation as stated by the Supreme Court of Ohio in Haddon View.  McCarthy, Lebit, 87 Ohio App. 3d at 632.  Under the tort of negligent misrepresentation, a person who supplies false information to others in breach of the common law duty not to do so is liable for "pecuniary loss" to them.  Id.  Because "'pecuniary loss' is by its very definition 'economic loss,'" the economic loss rule cannot logically be applied to a negligent misrepresentation claim.  Id.

The Supreme Court of Ohio, although not directly addressing the issue, did provide some clarity regarding an action for negligent misrepresentation in Corporex.  There, the plaintiff's negligence action was barred by the economic loss rule.  Corporex, 106 Ohio St. 3d at 415-16.  In rejecting the plaintiff's argument that Haddon View applied to its case, the court stated that liability for negligent misrepresentation is based upon a duty in tort that preexists any contractual terms or rights accompanying privity.  See id. at 415.  "When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract."  Id.  Thus, the critical determination is the source of the defendant's duty.

The Sixth Circuit, relying on McCarthy, Lebit, has specifically stated that the economic loss rule does not apply to a claim of negligent misrepresentation.  HDM, 332 F.3d at 1032.  In HDM, an owner of a helicopter brought a claim, inter alia, of negligent misrepresentation against the manufacturer of the helicopter's landing gear after an accident.  Id. at 1027.  The court first

12

discussed Ohio's economic loss rule at length and then applied the rule to the plaintiff's tort claims of strict liability and implied warranty, following "cautionary dicta" in Chemtrol. Id. at 1029-30. The court thereafter noted that it is incorrect to apply the economic loss rule to a negligent misrepresentation claim.  Id. at 1032.

Rexius argues that the statement in HDM regarding negligent misrepresentation claims and the economic loss rule was dictum and should not control the decision in this case.  Although the defendant in HDM may have ultimately agreed that the economic loss rule would not bar a negligent misrepresentation claim under Ohio law, the court initially noted that the defendant had originally sought summary judgment on the negligent misrepresentation claim because of a mistaken belief that the economic loss rule prohibits recovery for any type of tort claim.  Id.  The court then concluded that the plaintiff had correctly responded that the economic loss rule does not apply to claims for negligent misrepresentation.  Id.

Rexius also argues that, in any event, McCarthy, Lebit, which was cited in HDM and relied upon by National Mulch, is not consistent with the Supreme Court of Ohio's holding in Floor Craft or subsequent decisions by the United States District Court for the Northern District of Ohio in Trgo v. Chrysler Corp., 34 F. Supp. 2d 581, 595 (N.D. Ohio 1998), and Picker International, Inc. v. Mayo Foundation, 6 F. Supp. 2d 685, 688-89 (N.D. Ohio 1998).

This Court cannot conclude that McCarthy, Lebit is inconsistent with Floor Craft.  In Floor Craft, the plaintiff flooring installation contractor asserted a claim against an architectural firm for negligence in its design specifications.  Floor Craft, 54 Ohio St. 3d at 2.  It does not appear that the Floor Craft court directly addressed the application of the economic loss rule to a claim of negligent misrepresentation.  Instead, the court held that in the absence of privity, a party could not recover

13

economic damages in tort.  Id. at 8.  Although the claim in Floor Craft against the architectural firm was for negligence, the court did briefly entertain the argument that Haddon View applied to the firm's design flaws.  However, it settled the issue quickly and decided that the plaintiff could not rely upon Haddon View because the architects' services were extended to an unlimited number of persons who could possibly rely upon them.  Id. at 7.  The court never directly addressed whether the economic loss rule applied to a claim of negligent misrepresentation.  Thus, Floor Craft stands for the general proposition that in the absence of privity between the parties, the economic loss rule bars recovery of economic losses in tort.  Id. at 8.

Consistent with this approach, McCarthy, Lebit recognizes that "[t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement."  McCarthy, Lebit, 87 Ohio App. 3d at 630 (quoting Floor Craft, 54 Ohio St. 3d at 7).  The court in McCarthy, Lebit, however, also found that adoption of the economic loss rule in Floor Craft does not necessarily preclude recovery under a negligent misrepresentation claim.  Id. at 631.  The McCarthy, Lebit court decided that a plaintiff claiming only economic damages was not barred from asserting an action for negligent misrepresentation.  This holding is not inconsistent with Floor Craft; the McCarthy, Lebit court recognized that an exception to the general rule from Floor Craft must logically exist based upon the elements of the tort of negligent misrepresentation as articulated in Haddon View.

Moreover, since Floor Craft and McCarthy, Lebit, the Ohio appellate courts have routinely allowed a negligent misrepresentation cause of action when damages are exclusively economic in nature.  See Universal Contracting; Three-C Body Shops, Inc. v. Welsh Ohio, LLC, No. 02AP-523, 2003 WL 360958, 2003-Ohio-756 (Ohio App. 10th Dist. Feb. 20, 2003); Ferro; Bowling Trans., Inc.

v. Gregg, 103 Ohio App. 3d 539 (1995); Lippy v. Society Nat'l Bank, 100 Ohio App. 3d 37 (1995);

Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth., 88 Ohio App.

3d 73 (1993).

    This Court also finds Rexius's citations to Picker and Trgo unpersuasive.  In Picker, the court

stated that "[i]n Ohio it is well established that a party cannot bring a cause of action in tort (such

as negligent misrepresentation) for economic losses."  Picker, 6 F. Supp. 2d at 688-89.  This

proposition was supported by citations to Queen City Terminals, Inc. v. General American

Transportation Corp., 73 Ohio St. 3d 609, 614 (1995), and Floor Craft.  However, neither of these

decisions discussed negligent misrepresentation in their analysis of the economic loss rule.  In any

event, the court in Picker ultimately dismissed the negligent misrepresentation claim on other

grounds.

    Although Trgo involves facts that are somewhat similar to this case, the court's reasoning

is unpersuasive.  In Trgo, purchasers of a truck brought a diversity action against the manufacturer

alleging inter alia negligent misrepresentation.  The court concluded that the plaintiffs were "barred

from pursuing the negligent misrepresentation claim by the economic loss doctrine."  Trgo, 34 F.

Supp. 2d at 595.  The authorities relied upon by the Trgo court, however, do not support this

conclusion.  The court first referred to Chemtrol and Midwest Ford, Inc. v. C.T. Taylor Co., 118

Ohio App. 3d 798, 801-05 (1997), in its discussion of the application of the economic loss rule to

the plaintiffs' claim of tortious breach of warranty.  Trgo, 34 F. Supp. 2d at 594.  Neither Chemtrol

nor Midwest Ford, however, specifically addressed the application of the economic loss rule to

claims of negligent misrepresentation.[5]  Trgo also cited Picker in support of its conclusion.  Id. at

595.  However, as was discussed supra, Picker is unpersuasive on this issue. In addition, the Court

notes that both Picker and Trgo were decided prior to HDM and Corporex and appear to be contrary

to those decisions.[6]

Finally, Rexius attempts to distinguish cases cited by National Mulch as not involving

commercial entities engaged in the sale of goods.  Ohio courts, as Rexius notes, have stated that the

economic loss rule denies recovery of purely economic damages when a commercial buyer has

remedies available under article 2 of the U.C.C.  See Sun Refining & Marketing Co. v. Crosby

Valve & Gage Co., 68 Ohio St. 3d 397, 398 (1994) (citing Chemtrol); Chemtrol, 42 Ohio St. 3d at

51; Graphic Enters., Inc. v. TAS Int'l, Inc., No. 1999CA00085, 2000 Ohio App. LEXIS 961, at *15

(5th Dist. Mar. 13, 2000) (citing Chemtrol).  However, each case stating this proposition involved

a buyer claiming that the goods were either defective or nonconforming; none confronted the issue

of whether the U.C.C. precluded a claim for negligent misrepresentation.[7]

---

[5] Rexius relies on both Midwest Ford and Sun Refining & Marketing Co. v. Crosby
Valve & Gage Co., 68 Ohio St. 3d 397, 398 (1994), in support of its claim that commercial
parties cannot recover for solely economic loss under Ohio law.  Both Midwest Ford and Sun
Refining are distinguishable from the present case because in those cases the economic loss rule
was applied to claims resulting from a defective product, not negligent misrepresentation claims.

[6] Rexius also directs the Court's attention to Bailey Farms, Inc. v. Nor-Am Chemical Co.,
27 F.3d 188 (6th Cir. 1994), and asks the Court to follow that decision.  In addition to being
decided nearly ten years before HDM, Bailey Farms is predicated on Michigan's interpretation
of the economic loss rule, not Ohio's.

[7] But, see Universal Contracting, 2004 WL 3015325, at *5, 2004-Ohio-7133 at ¶ 20,
where the court stated that when parties have contracted with each other, "contract principles
override the tort principles in Section 552, and economic damages are not recoverable except as
provided in the contract or by the rules of contract interpretation."  This proposition was
supported by a Washington state case and one Ohio case, Textron Financial Corp. v. Nationwide
Mutual Insurance Co., 115 Ohio App. 3d 137, 151 (1996).  Textron, however, does not support
(continued...)

16

The primary concern of the economic loss rule is the source of the duty, i.e., whether the duty arises under tort law or from an agreement between the parties.  See Chemtrol, 42 Ohio St. 3d at 45. The U.C.C. provides remedies for breaches of contractual duties; but, as was discussed supra, a cause of action for negligent misrepresentation is based upon a duty arising under the common law of torts.  Ohio law does not support Rexius's contention that National Mulch cannot assert a negligent misrepresentation claim simply because it also has remedies available under the U.C.C.

Thus, for the reasons stated, the Court does not believe that under Ohio law a negligent misrepresentation claim is barred by the economic loss rule.  Summary judgment on this ground is therefore denied.

### 2. Special Relationship

Next, Rexius argues that National Mulch's negligent misrepresentation claim lacks merit because National Mulch has failed to establish a "special relationship" between itself and Rexius. National Mulch argues in response that it is not required to establish a special relationship to succeed on its negligent misrepresentation claim.  This Court agrees that a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law.  Instead, as was stated supra, in order to assert a negligent misrepresentation claim under Ohio law, a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business

---

[7](...continued)
barring recovery whenever the parties are related by privity.  Consistent with Corporex, that case states that negligent representation will not lie for breaches of duties that are created by contract. Id.  The defendant's duty to supply accurate information to the plaintiff in Universal Contracting was a specific contractual term, and therefore did not arise in tort.  Universal Contracting, 2004 WL 3015325, at *6, 2004-Ohio-7133 at ¶ 22.  In light of Corporex, this Court does not believe that Universal Contracting's general rule prohibiting contracting parties from maintaining a claim for negligent misrepresentation accurately reflects the law of Ohio.

transactions, that the plaintiff was justified in relying on the information, and that the defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information. Delman, 41 Ohio St. 3d at 4.

To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions.[8] The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs.  As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." Gutter v. Dow Jones, Inc., 22 Ohio St. 3d 286, 288 (1986); accord Haddon View, 70 Ohio St. 2d at 157 (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons).  "A contrary result would in effect extend liability to all the world and not a limited class . . . ." Gutter, 22 Ohio St. 3d at 289.

Understanding this, a person may not maintain an action for negligent misrepresentation when the alleged misrepresentation is intended to reach an extensive, unresolved class of persons. Representations made to the public-at-large cannot result in liability.  E.g., id. (newspaper reader not a member of a limited group of persons intended to benefit from representation in newspaper);

_____

[8] Rexius relies on Picker in support of its assertion that a special relationship is required. However, similar to Ohio courts addressing a "special relationship," the court in Picker specifically defined the "special relationship" as "the defendant suppl[ying] information to the plaintiff for the latter's guidance in its business transactions."  Picker, 6 F. Supp. 2d at 689.  This is merely a reiteration of one of the elements of the cause of action for negligent misrepresentation.

Amann v. Clear Channel Commc'ns, Inc., 165 Ohio App. 3d 291, 298-99 (2006) (radio station's general audience not a limited group); Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App. 3d 366, 384-85 (2000) (investing public is an unlimited class of persons that cannot hold company's auditor liable for alleged negligent misrepresentations).

Conversely, liability may exist when the plaintiff is a person or member of a limited class of persons whom the defendant intends to benefit or guide with the information supplied.  See, e.g., Haddon View, 70 Ohio St. 2d at 157 (representation made to small group of limited partners); Merrill v. William E. Ward Ins., 87 Ohio App. 3d 583, 590-91 (1993) (beneficiaries of a life insurance policy were a foreseeable limited class intended to benefit from information supplied by insurance agent); Sindel v. Toledo Edison Co., 87 Ohio App. 3d 525, 528 (1993) (representation made to single customer of defendant electric company).  All that is necessary is for "'the maker of the representation [to] intend[] to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information.'"  Amann, 165 Ohio App. 3d at 299 (quoting Restatement (Second) of Torts § 552 cmt. h (1977)).  Thus, National Mulch can prevail on its negligent misrepresentation claim only if the alleged misrepresentations were intended to benefit or guide a group of persons with a definable limit, and National Mulch was a member of that group.

The determination of whether the plaintiff is a member of a limited class of foreseeable persons is dependent upon the factual circumstances of the representations made and the relationship between the parties.  See id. at 298.  In this case, the alleged misrepresentations appear in marketing materials produced by Rexius.  Certainly, the potential exists for these materials to be seen by a large, limitless group of people.  However, it is undisputed that Rexius sent the materials directly

to National Mulch via mail in response to the latter party's interest in the Rexius trucks.  (Will Dep. 53-55; Def.'s Mem. Supp. Mot. Partial Summ. J. 3, R. at 88-2; <u>see</u> Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Neg. Misrep. Exs. 3-4.)  Further, National Mulch has put forth evidence that the alleged misrepresentations were made to it orally as well.  (Fischer Decl. ¶ 4, Dec. 30, 2005.)

Viewing the facts in a light most favorable to National Mulch, it cannot be said that as a matter of law National Mulch was a member of a faceless or unresolved class of persons.  Instead, reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made.  The marketing materials and oral representations were specifically directed to National Mulch.  Although the marketing materials could eventually be disseminated to an indefinite number of persons, these representations were intended to reach and influence particular persons: National Mulch and its principals.

Rexius also argues, in essence, that under Ohio law a party to an "ordinary business transaction" cannot provide information to the other party for guidance in that transaction.  In support, Rexius points to language in <u>Picker</u> that states that the "special circumstances" where a person supplies information to another for guidance in a business transactions does not exist when the relationship between the parties is nothing more than an ordinary business transaction.[9]  <u>Picker</u>, 6 F. Supp. 2d at 689 (citing <u>Haddon View</u>, 70 Ohio St. 2d at 157; <u>Gutter</u>, 22 Ohio St. 3d at 288-89). The Court does not believe that Ohio law supports this limitation.  First, neither <u>Haddon View</u> nor

_____

[9] Other federal cases state the same proposition.  <u>See</u> <u>Cuyahoga Metro. Hous. Auth. v. 10-8 Sys., Inc.</u>, No. 1:05-cv-0980, 2006 WL 543103, at *5 (N.D. Ohio Mar. 2, 2006) (relying exclusively on <u>Picker</u>); <u>Hayes v. Computer Assocs. Intern, Inc.</u>, No. 3:02-cv-7452, 2003 WL 21478930, at *6-7 (N.D. Ohio June 24, 2003) (relying exclusively on <u>Picker</u>); <u>Bank One v. Fin. Ventures, LLC</u>, No. C2-01-0049, 2002 WL 484394, at *4-5 (S.D. Ohio Mar. 26, 2002) (rule stated identically to <u>Picker</u>).

20

Gutter announces such an exclusion either expressly or implicitly, and neither case involved a business transaction between the plaintiff and the defendant.  Second, a broad rule like this seemingly contradicts the inclusion of liability for negligent misrepresentation when a person supplies false information "in any . . . transaction in which he has a pecuniary interest."  Delman, 41 Ohio St. 3d at 4 (emphasis added).

A number of Ohio courts have been confronted with a claim for negligent misrepresentation where the information was supplied to the opposite party in a business transaction.  The majority of these cases do not support a determination that information supplied to a person in the course of a business transaction cannot be supplied for that person's guidance.  See, e.g., Lippy, 100 Ohio App. 3d at 45-46 (finding negligent misrepresentation made in the context of a business transaction with a bank actionable even in absence of a fiduciary relationship); McCarthy, Lebit, 87 Ohio App. 3d at 634 (noting that nothing supports prohibiting a claim for negligent misrepresentation when parties are "directly related to each other pursuant to contract negotiations"); see also Leal v. Holtvogt, 123 Ohio App. 3d 51, 61-64 (1998).  But see discussion of Universal Contracting supra note 7.  Admittedly, these Ohio cases do not involve transactions for the sale of goods.  However, Rexius does not offer and this Court cannot ascertain any principled reason why the subject matter of the transaction should be relevant to determining whether a person supplies information to the opposite party in a business transaction for the latter party's guidance.  Thus, the Court concludes that Ohio law does not support barring a cause of action for negligent misrepresentation because the defendant supplied information to guide the plaintiff in a business transaction with the defendant.

Therefore, as discussed supra, a "special relationship" is not a formal element of a claim for negligent misrepresentation under the law of Ohio.  Rather, the "special relationship" is a

characterization of the requirements that for liability to exist: (1) the defendant must provide false information for the guidance of the plaintiff in its business transactions and (2) the plaintiff must be the person or one of a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it.  The Court concludes that summary judgment should be denied as to the second requirement stated above because reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made.

As to the first requirement stated above, the Court notes that in its motion Rexius did not raise the issue of whether it intended to provide guidance to National Mulch with the alleged misrepresentations.  Furthermore, Rexius did not contest the alleged falsity of the statements at issue.  Recognizing this, National Mulch did not address these issues in its Memorandum Contra. The Court will not consider these issues because the parties have not moved the Court for summary judgment on them.

### 3.  Omissions

Finally, Rexius argues that National Mulch's negligent misrepresentation is impermissibly based, in part, on alleged omissions.  In its complaint, National Mulch alleges:

In addition to the misrepresentations, Defendant failed to disclose the following:

    a.    That the PTO was not sufficient and durable enough for the Rexius Express Blower's use, with the result being significant maintenance problems.

    b.    That there would be significant bridging of the product, as a result of the problems with the conveyor, which results in significant delay.

    c.    That the moisture content causes the product to colligate, thus further diminishing productivity.

22

(Compl. ¶ 16.)  Rexius asks the Court to grant summary judgment in its favor to the extent that National Mulch's claim of negligent misrepresentation is based upon these alleged omissions.

Rexius correctly states that "'negligent misrepresentation does not lie for omissions; there must be some affirmative false statement.'"  Leal, 123 Ohio App. 3d at 62 (quoting Zuber v. Ohio Dep't of Ins., 34 Ohio App. 3d 42, 45-46 (1986)); accord, e.g., Manno v. St. Felicitas Elementary Sch., 161 Ohio App. 3d 715, 724 (2005); Gentile v. Ristas, 160 Ohio App. 3d 765, 789 (2005).  The defendant must supply information for a negligent misrepresentation to occur.

National Mulch does not dispute that a negligent misrepresentation claim requires affirmative false statements.  It acknowledges that paragraph 16 the complaint alleges that Rexius failed to disclose certain information to National Mulch, but explains that these allegations go to the falsity of the affirmative representations made by Rexius, alleged in paragraph 14 of the complaint.  Also, the allegations of Rexius's failure to disclose are immediately preceded in paragraph 16 by an allegation that Rexius did not exercise reasonable care in making affirmative statements.

Rexius has not disputed that the allegations contained in paragraph 16 do not allege facts relevant to the falsity of the affirmative statements or Rexius's exercise of care.  Its argument is instead limited to its assertion that a failure to disclose information cannot support a claim for negligent misrepresentation.  Because Rexius is correct in this regard, its motion is granted to the extent, if any, that National Mulch's claim of negligent misrepresentation is based upon omissions of fact.

**D.  Warranty Claims**

National Mulch has also asserted three warranty claims in this case: (1) breach of express warranties, (2) breach of implied warranty of merchantability, and (3) breach of implied warranty

23

of fitness for a particular purpose.  The parties have filed cross-motions for partial summary judgment with respect to National Mulch's warranty claims.  In its motion for partial summary judgment, National Mulch seeks to establish that the representations made by Rexius constitute express warranties as a matter of law.  Rexius, on the other hand, argues that the representations at issue, as alleged by National Mulch, do not constitute express warranties, that the parties effectively disclaimed all warranties in the Sales Quote, and that National Mulch is barred by the parol evidence rule from introducing evidence of any representations that contradict the terms of the Sales Quote. National Mulch responds that the disclaimer on the back of the Sales Quote did not become part of the parties' agreement and that the parol evidence rule has no application in this case.  Finally, Rexius contends that summary judgment is appropriate regarding two of the representations at issue because, even if the representations are express warranties, Rexius did not breach them.

**1.  Express Warranties**

In Count I of the Complaint, National Mulch alleges that

> Defendant breached each express warranty in that the Rexius Express Blower (a) is not trouble-free, is not free from defects in material and workmanship, is not economical to operate, was not manufactured with high quality material and workmanship; (b) cannot be effectively operated with only one person; (c) cannot blow 55 cubic yards per hour with only one operator; (d) has significant maintenance costs; and (e) as to National Mulch, the dye feature does not effectively dye mulch.

(Compl. ¶ 11.)  In resolving the parties' cross-motions for partial summary judgment on National Mulch's express warranty claim, this Court must answer four questions: (1) does the parol evidence rule bar evidence of alleged express warranties extrinsic to the Sales Quote; (2) were any such express warranties actually created; (3) if so, were express warranties effectively disclaimed by the Sales Quote; and (4) if the agreement did include warranties that, with only one person, the Rexius trucks can blow 55 cubic yards per hour, were these warranties breached.

### a. Parol Evidence Rule

As noted by Rexius, National Mulch's express warranty claim is based on alleged warranties that are extrinsic to the Sales Quote. Rexius argues that National Mulch's express warranty claim must fail because the parol evidence rule bars evidence of any prior representations that are inconsistent with the Sales Quote. National Mulch, on the other hand, argues that the parol evidence rule does not apply under the facts of this case.

In this case involving the sale of commercial mulch-blowing trucks, there is no dispute that the Uniform Commercial Code as adopted by Ohio applies to the warranty claims asserted by National Mulch.[10] Ohio Revised Code § 1302.05 provides the relevant statutory language in connection with the parol evidence rule:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (A)     by course of dealing or usage of trade as provided in section 1301.11 of the Revised Code or by a course of performance as provided in section 1302.11 of the Revised Code; and
>
> (B)     by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ohio Rev. Code § 1302.05. As recognized by the Supreme Court of Ohio, the parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from

---

[10] Again, this Court notes that the parties appear to agree that Ohio law applies. Moreover, this Court also notes that the U.C.C. sections applicable to this case are identical in all relevant respects under both Ohio law and Oregon law. Compare Ohio Rev. Code §§ 1302.01-.98 with Or. Rev. Stat. §§ 72.1010-.7250.

25

contradicting the terms of the contract with evidence of other alleged agreements.  Ed Schory &
Sons, Inc. v. Soc'y Nat'l Bank, 75 Ohio St. 3d 433, 440 (1996).  "When two parties have made a
contract and have expressed it in a writing to which they have both assented as the complete and
accurate integration of that contract, evidence, whether parol or otherwise, of antecedent
understandings and negotiations will not be admitted for the purpose of varying or contradicting the
writing."  Id. (internal quotation and citation omitted).

    As was noted supra, the representations at issue in this case, as alleged by National Mulch,
were made prior to the Sales Quote and are not referenced by that agreement.  Such representations
are therefore extrinsic to the Sales Quote.  In order to determine whether the parol evidence rule bars
evidence of such representations, this Court must first determine whether the Sales Quote represents
the final agreement of the parties.  If the parties did not intend for the Sales Quote to be a final
expression of their agreement, then the parol evidence rule does not apply.  If the Sales Quote does
represent the parties' final agreement, then application of the parol evidence rule will depend upon
whether the Sales Quote is a "complete and exclusive statement of the terms of the agreement
between the parties."

    Whether a document represents the final expression of the parties' agreement and, if so,
whether it is "complete and exclusive" of other terms are questions of law to be resolved by the
court.  Camargo Cadillac Co. v. Garfield Enters., Inc., 3 Ohio App. 3d 435, 437-38 (1982).  The
court makes this determination by looking at the document itself and also considering all relevant
evidence "presented by the parties about their intentions."  Id.

    The language of the Sales Quote is ambiguous with respect to whether it is the final
agreement between the parties.  Although not conclusive, the Sales Quote does not contain a

traditional "merger" or "integration" clause.[11]  See Burke v. Manfroni, No. 83231, 2004 WL 397276, at *3 (Ohio App. 8th Dist. Mar. 4, 2004).  In fact, the Sales Quote does not contain any statement that clearly indicates that the parties intended for the Sales Quote to represent their final agreement. On the contrary, the Sales Quote appears to anticipate the possibility, at least, for additional agreements.  It specifically provides that "any additional or different terms proposed by Buyer are hereby rejected unless expressly assented to in writing by Seller."  (Sales Quote ¶ 9, Apr. 3, 2000.)

It is clear, based on the evidence and arguments made by National Mulch, that it did not consider the Sales Quote to be the final, complete, and exclusive statement of the terms of the agreement.  The evidence also reflects that even Rexius did not consider the Sales Quote to represent the final, complete, and exclusive statement of the terms of the agreement.  In connection with its argument earlier in this litigation regarding venue, Rexius submitted an "Express Blower Limited Warranty," which disclaimed other express warranties, and argued that this document was part of the parties' agreement.[12]  Rexius Co-President Arlen Rexius testified that the Limited Warranty was routinely given in connection with the sale of its mulch-blowing trucks.  (Rexius Aff. ¶ 9; accord

---

[11] Rexius's reliance on Paragon Networks International v. Macola, Inc., No. 9-99-2, 1999 Ohio App. LEXIS 2091, at *9-10, 14 (Ohio App. 3d Dist. Apr. 28, 1999), for its assertion that the Sales Quote contains an integration clause is not well-taken.  Integration clauses are "[r]ecitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing [or] that the parties are not to be bound except by the writing."  11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 33:21, at 661 (4th ed. 1993).  The license agreement in Paragon contained an integration clause that stated that "unless specifically covered by another license agreement, . . . [this Agreement] is the complete agreement between us and it supersedes any prior purchase order, communications, advertising or representations."  Paragon, 1999 Ohio App. LEXIS 2091, at *8 (alteration in original).  This language clearly shows the parties' intent to not be bound in any way other than the writing.  The Sales Quote in this case contains no similar language.

[12] Rexius makes the same argument now in its response to National Mulch's motion for partial summary judgment.

Drennan Aff. ¶¶ 5, 14.)  Drennan testified that National Mulch would have received this Limited Warranty during training, before the April 3, 2000 Sales Quote was signed.  (Drennan Aff. ¶¶ 5-6.) The Limited Warranty is extrinsic to the Sales Quote and directly contradicts the latter document's clause disclaiming all warranties.  Under these facts, the parol evidence rule prescribes that the Limited Warranty could only be a part of the agreement if the Sales Quote was <u>not</u> a final expression of the parties' agreement.  As Rexius has continuously asserted that the Limited Warranty was part of the parties' agreement, it could not have intended for the Sales Quote to represent the final statement of the terms of the agreement.

In any event, this Court must construe any ambiguity contained in the Sales Quote against Rexius, the party responsible for preparing that agreement.  <u>See</u> <u>Graham v. Drydock Coal Co.</u>, 76 Ohio St. 3d 311, 314 (1996) (citing <u>Central Realty Co. v. Clutter</u>, 62 Ohio St. 2d 411, 413 (1980)). Rexius has failed to demonstrate that the Sales Quote represents the final expression of the terms of the parties' agreement.  Therefore, the parol evidence rule, as set forth in Ohio Revised Code § 1302.05, will not preclude National Mulch from introducing evidence of extrinsic representations made by Rexius.

### b. Creation of Express Warranties

Next, Rexius argues that any representations made regarding the EB-60 do not amount to express warranties, and that it is therefore entitled to partial summary judgment.  National Mulch argues that partial summary judgment should be granted in its favor on this issue because several statements made by Rexius concerning the productivity and reliability of the EB-60 created express warranties.

28

As was noted supra, this case is governed by the U.C.C. as adopted by Ohio.  The Ohio

Revised Code makes it clear that formal words such as "warrant" or "guarantee" are not necessary

to create an express warranty.  Ohio Rev. Code § 1302.26(B).  Instead, an express warranty is

created by:

     (1)     Any affirmation of fact or promise made by the seller to the buyer which
              relates to the goods and becomes part of the basis of the bargain . . . .

     (2)     Any description of the goods which is made part of the basis of the
              bargain . . . .

     (3)     Any sample or model which is made part of the basis of the bargain . . . .

§ 1302.26(A).  A seller's advertisement of its product may constitute an express warranty so long

as the statement in the advertisement fulfills the requirements of § 1302.26(A).  See, e.g., Jones v.

Kellner, 5 Ohio App. 3d 242, 242-43 (1982).  However, an affirmation of the value of the goods or

a statement purporting to be merely the seller's opinion or commendation of the goods does not

create an express warranty.  § 1302.26(B).

### i. Statements Regarding the Trucks' Productivity

With respect to productivity, National Mulch alleges that Rexius warranted that the EB-60

trucks, using only one person, could blow 55 cubic yards per hour and that they could be used

effectively by only one person.[13]  (Compl. ¶ 7.)  Rexius does not dispute that its sales materials

indicated that, "[w]ith most material, the EB-60 can blow nearly a full cubic yard per minute,

making even the biggest jobs manageable," that the "Express Blower, using only one person, can

---

[13] These statements will be referred to as the productivity statements.

blow 55 cubic yards per hour," and that the Express Blower could be operated by one person.[14] (Rexius Marketing Lit., Exs. 3-4 to Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Neg. Misrep.)

As an initial matter, Rexius asserts that its statement that the trucks could blow 55 cubic yards per hour with most material cannot be an express warranty because, as a matter of law, "statements of maximum performance do not create a warranty of guaranteed daily output."  The Court does not find this contention supported by Ohio law.  First, National Mulch has not alleged that Rexius made an express warranty about the guaranteed daily output of the trucks.  By its plain meaning, the statement that the trucks "can blow 55 cubic yards per hour" does not make a guarantee of what the buyer's actual daily output will be with the trucks.  The statement only concerns the trucks' maximum performance.

Second, under § 1302.26(A), any affirmation of fact relating to the goods can create an express warranty.  There is no logical reason to exclude statements of a product's maximum performance.  Moreover, other courts have specifically found that statements of maximum performance can create express warranties.  E.g., Abele v. Bayliner Marine Corp. 11 F. Supp. 2d

---

[14] Although the Complaint alleges that Rexius breached an express warranty that the "Express Blower, using only one person, can blow 55 cubic yards per hour," (Compl. ¶ 7) National Mulch moves the Court for summary judgment on the issue of whether an express warranty was created warranting that the Express Blowers "can blow 55 cubic yards per hour using 'most material.'"  (Pl.'s Mem. in Opp'n 1 n.1; accord Pl.'s Mot. Partial Summ. J. Creation Express Warr. & Failure to Disclaim Warr. 5.)

955, 964 (N.D. Ohio 1997) (rejecting the argument that a representation that a boat could go at least

40 mph could not create an express warranty under § 1302.26(A)).[15]

Rexius also argues that the productivity statements cannot be express warranties because

they were not part of the basis of the parties' bargain.  An affirmation of fact is part of the basis of

the parties bargain if it induces the buyer to purchase the product.  Wagner v. Roche Labs., 85 Ohio

St. 3d 457, 459 (1999).  To determine whether a representation is an affirmation of fact that became

a part of the basis of the bargain, the Court must consider the surrounding circumstances of the sale,

including: (1) the reasonableness of the buyer in believing the seller, (2) the reliance placed on the

seller's statement by the buyer,[16] and (3) whether the seller assumes to assert a fact of which the

buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing.

Abele, 11 F. Supp. 2d at 963; Norcold, Inc. v. Gateway Supply Co., 154 Ohio App. 3d 594, 600

(2003); Slyman v. Pickwick Farms, 15 Ohio App. 3d 25, 28 (1984).

Construing the facts in the light most favorable to Rexius, this Court determines that

reasonable minds could only conclude that these representations constitute affirmations of fact

---

[15] Contrary to Rexius's assertion, neither Chic Promotion, Inc. v. Middletown Security Systems, Inc., 116 Ohio App. 3d 363 (1996), nor HDM Flugservice GMBH v. Parker Hannifin Corp., 332 F.3d 1025 (6th Cir. 2003), holds otherwise as neither case involved statements of a product's maximum performance.  In Chic Promotion, the statements included in an alarm systems manufacturer's brochure did not create express warranties because the brochure did not make statements concerning the specific alarm system configuration purchased by the plaintiff. Chic Promotion, 116 Ohio App. 3d at 369.  Instead, the brochure provided  general descriptions of what the security system could do depending on how the system was customized.  Id.  The court in HDM held that a statement by a manufacturer that an aircraft part had a maximum "service life" of 3,500 hours did not create an express warranty that the part would properly perform for a minimum of 3,500 hours.  HDM, 332 F.3d at 1033, 1035.

[16] Under Ohio law, reliance is not a formal element of a claim for breach of an express warranty.  See Norcold, Inc. v. Gateway Supply Co., 154 Ohio App. 3d 594, 596 (2003).

and/or descriptions of the goods as set forth in Ohio Revised Code § 1302.26(A).  This conclusion

is supported by a number of cases decided under Ohio law where statements of a similar nature were

deemed to be affirmations of fact or descriptions of the goods.  See, e.g., Abele, 11 F. Supp. 2d at

964; Ohio Savings Bank v. H.L. Vokes Co., 54 Ohio App. 3d 68, 71-72 (1989).  A question remains,

however, whether the representations regarding the EB-60's productivity became part of the basis

of the bargain.

Rexius submits that the affirmations regarding the EB-60's productivity could not have

become part of the basis of the bargain because National Mulch did not rely upon the statements

when agreeing to the bargain.[17]  In support, Rexius first argues that the Court must consider the

warranty disclaimer contained on the reverse side of the Sales Quote in determining whether the

productivity statements were part of the basis of the parties' bargain.

Certainly the existence of a disclaimer in a written contract is a factor in deciding whether

a warranty was part of the parties' agreement.  However, creation of an express warranty and that

warranty's negation are distinct issues under the U.C.C.  Ohio Revised Code § 1302.26 governs the

creation of express warranties while § 1302.29 controls the determination of whether warranties

---

[17] National Mulch responds to this argument by contending that facts that show no
reliance on the statements should be ignored by this Court because they are irrelevant to the
issue of whether express warranties were created and are therefore non-responsive to National
Mulch's motion.  This contention is incorrect for two reasons.  First, National Mulch has moved
for partial summary judgment on the issue of "creation of express warranties by Defendant."
(Pl.'s Mot. Partial Summ. J. Creation Express Warr. & Failure to Disclaim Warr. 1.)  As
discussed supra, the creation of an express warranty is dependent upon whether the statement
was part of the basis of the bargain, and the buyer's reliance is a factor in making this
determination.  Second, Rexius has moved for partial summary judgment on the same issue,
arguing the absence of reliance.  (See Def.'s Mot. Partial Summ. J. Breach Warr. Claims 2.)
Thus, whether National Mulch relied upon the statements about the trucks' productivity is
relevant to the disposition of both parties' motions.

were negated or disclaimed.  Words in a warranty disclaimer are evidence of an already existing warranty being negated or limited, not of a warranty's creation.  See Ohio Rev. Code § 1302.29(A) (In deciding whether a warranty was disclaimed, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed . . . with each other." (emphasis added)).  Thus, any fact showing the existence of a warranty disclaimer in the written agreement is not relevant to the issue of whether an affirmation of fact or description of the goods became a part of the basis of the bargain.  Rather, such evidence is properly applied to the determination of whether an express warranty created earlier was negated or limited.[18]

Other evidence, however, does suggest that National Mulch did not rely upon the statements concerning the EB-60's productivity.  Will testified that National Mulch's business plan did not reflect operating the Rexius trucks with only one person.  (Will Dep. 41-42.)  National Mulch did not anticipate that its trucks would put out 55 cubic yards per hour during its jobs, and its business plan was not based on this output.  (Id. at 56-57, 65.)  Instead, National Mulch used more conservative numbers in its business plan.  (Fischer Dep. 34-35; Fischer Decl. ¶ 12, Feb. 13, 2006; Fischer Decl. ¶ 3, Apr. 24, 2006; Will Dep. 52, 65.)

The marketing material containing the productivity statements also contains other information about the Rexius Express Blowers' productivity.  Notably, the literature sent to National Mulch included an "Operating Cost Analysis" sheet that depicts costs estimates for a hypothetical mulch delivery job.  (Rexius Marketing Lit.)  Rexius argues, in essence, that this analysis shows that National Mulch, in making its decision to purchase, could not have reasonably relied on the statement that the trucks can blow 55 cubic yards per hour.  The analysis is based upon an

---

[18] Whether the parties effectively disclaimed express warranties is discussed infra.

assumption that a job requiring delivery of 45 cubic yards of mulch will take five hours to complete, including time spent for "loading, [40 miles of] travel, customer service, cleanup and blower time." (Id.) At the bottom of the sheet appears a note which states that "Rexius makes no claim, expressed or implied, as to what your actual costs might be" and that the analysis "should be used for general understanding only and not for the use in making financial commitments." (Id.)

Rexius states that the "Operating Cost Analysis" sheet shows "a real world application of 9 cubic yards an hour." This statement appears to be accurate so long as "application" is understood to mean the total time required to complete a job. However, as the sheet contains no statement of how long it takes to actually blow 45 cubic yards,[19] the analysis provides no discernable rate at which the trucks blow mulch in the "real world." Irrespective of what the hypothetical truck's actual productivity is, the analysis seems to suggest that the rate is something less than 55 cubic yards per hour. This and the note at the bottom of the sheet are relevant to show a lack of reliance by National Mulch upon the statements that the trucks can blow 55 cubic yards with most material.

Additionally, there is evidence that shows that National Mulch was not completely ignorant regarding the trucks' productivity. Prior to entering into an agreement with Rexius, Fischer and Will had been in contact with Fischer's brother in Florida who had been operating Rexius trucks. (Fischer Dep. 13-15; Will Dep. 18-37.) In connection therewith, National Mulch received and considered information about Fischer's brother's business, Florida Mulch Express, Inc. ("Florida Mulch"), including its business plan. (Fischer Dep. 23-25.) Florida Mulch's business plan was based on an average throughput of 100 cubic yards per day per truck with each truck staffed by two

---

[19] Presumably, the actually blowing time in Rexius's hypothetical would be five hours minus the time spent loading, traveling 40 miles, providing customer service, and cleaning.

34

employees.  (Florida Mulch's Bus. Plan 9, 23, Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 54.)

National Mulch also had an opportunity to view how Rexius trucks operated under normal conditions when Fischer and Will visited Fischer's brother in Florida.  (Fischer Dep. 18-19; Will Dep. 23-24.)  While there, Fischer and Will observed Florida Mulch's trucks on jobs.  (Fischer Dep. 19-20; Will Dep. 26-32.)  Both Fischer and Will testified that Florida Mulch had multiple workers assigned to a single Rexius truck.  (Fischer Dep. 19; Will Dep. 29-30.)  Fischer's and Will's testimony shows that National Mulch had independent knowledge of the trucks' productivity.  This knowledge tends to diminish the reasonableness of its belief in the productivity statements made by Rexius.

In summary, there is considerable evidence to show that the productivity statements were not a part of the basis of the bargain between National Mulch and Rexius.  However, the record also contains evidence supporting the opposite conclusion.  Although Fischer and Will were able to learn much about the Rexius trucks in Florida, the information that they received was possibly not replete with enough facts for them to objectively determine the validity of Rexius's statements.  Will testified that Florida Mulch provided its financial projections to National Mulch, but did not disclose any information about its actual profitability other than that it "had been very busy." (Will Dep. 31-32.)  Florida Mulch did not give Fischer information about its actual profitability or its actual production, and Fischer did not review any Florida Mulch records other than its business plan. (Fischer Dep. 21-22).  Regarding throughput, Fischer stated that he could not tell how much mulch the Rexius trucks were putting out while he was observing them, (id. at 20), and that he did not recall discussing the actual throughput that Florida Mulch was receiving from its Rexius trucks.  (Id.

35

at 34-36.)  These portions of Fischer's and Will's testimonies depict National Mulch as lacking pertinent knowledge about the Rexius trucks' productivity.  This evidence helps to support a finding that the productivity statements asserted facts of which National Mulch was not aware on its own and that National Mulch acted reasonably in believing them.

Other testimony by Will and Fischer reflects that National Mulch relied on the productivity statements.  Will stated that National Mulch used the Rexius productivity statements as a guide for determining a conservative business plan.[20]  (Will Dep. 37-38, 40.)  Fischer testified that he believed, based on Rexius's representation of what the trucks could blow, that National Mulch would be able to have significantly greater throughput than the 100 cubic yards per day assumption in Florida Mulch's business plan.  (Fischer Dep. 34-35.)  According to Fischer, National Mulch "formulated its plan based in part on representations by Rexius that the EB-60 model Express blower could be operated effectively by only one person and apply 55 cubic yards per hour, using most materials."  (Fischer Decl. ¶ 2, Apr. 24, 2006.)

The Court is mindful that whether an affirmation becomes a part of the basis of the bargain and thereby becomes an express warranty is a question of fact normally left to the province of the jury.  See Lees v. Turek, No. 87 C.A. 6, 1987 WL 15351, at *2 (Ohio App. 8th Dist. Aug. 6, 1987).

--------

[20] Will testified,

> [W]e used the literature from Rexius as a guide, and based on the conversations I had had with Rexius and information I had received from Rexius, and then [sic] we attempted to make [National Mulch's business plan] more conservative than the basic numbers that Rexius provided us with. . . . We saw that the Rexius equipment was being warranted as being able to put down 55 cubic yards of mulch with one person.  We felt that was not conservative enough . . . .

(Will Dep. 37-38, 40.)

Both parties have moved for partial summary judgment on this issue.  As such, the Court must view the facts and reasonable inferences drawn thereon in favor of Rexius when deciding National Mulch's motion and in favor of National Mulch when deciding Rexius's motion.  However, with the aforementioned facts viewed in a light most favorable to either party, it cannot be said that reasonable minds could come to only one conclusion as to whether the statements regarding the Rexius trucks' productivity became a part of the basis of the bargain between the parties.  Instead, the record displays that, at this point in the litigation, whether the productivity statements were part of the basis of the bargain is a disputed issue of fact.  Thus, the Court concludes that neither party is entitled to partial summary judgment on the issue of whether an express warranty was created by the statements that (1) the Rexius Express Blower could be used effectively by only one person or that (2) the Rexius Express Blower, using only one person, can blow 55 cubic yards per hour with most materials.

### ii.  Statement Regarding the Trucks' Capability to Effectively Dye Mulch

National Mulch also alleges that Rexius made a representation that the EB-60 could effectively dye mulch.  (Compl. ¶ 7.)  Fischer states that Rexius made this representation both orally and in writing.  (Fischer Decl. ¶ 6, Feb. 13, 2006.)  The Court notes that the Rexius marketing literature submitted to the Court does not include statements about the truck's mulch-dying capability; however, Rexius has put forth no evidence showing that it did not make this representation, either in writing or orally.

There is no dispute that the EB-60 trucks could dye mulch.  (Fischer Dep. 222.)  The dispute in this case is over the word "effectively."  Fischer testified that when dyed mulch was applied, it would come out of the trucks wet.  (Id.)  Fischer contends that application of wet dye created clean-

up and liability issues, and he therefore concluded that the EB-60 could not "effectively" dye mulch and discontinued use of they dye function.  (Id.)

Rexius argues that use of the word "effectively" is merely a seller "puffing" its goods and does not create an express warranty.  As was noted supra, if use of the word "effectively" merely represents Rexius's opinion, then no express warranty was created.  See Ohio Rev. Code § 1302.26(B).  However, if the word "effectively" was an affirmation of fact, then the Court must determine whether it became part of the basis for the bargain.

A seller's affirmations go beyond puffing when they express an objective fact.  In Barksdale v. Van's Auto Sales, Inc., 62 Ohio App. 3d 724, 726 (1989), a purchaser of an automobile specifically inquired about the condition of the transmission and was told that it was in good working order and that nothing was wrong with it.  The court held that this representation went beyond puffing and was an affirmation of fact that became part of the "essence of the bargain."  Id. at 728.  Similarly, a seller's affirmation that a truck would be "just right for the purpose of commercial snow plowing" was held to be more than puffery in Society National Bank v. Pemberton, 63 Ohio Misc. 26, 28, 409 N.E.2d 1073, 1076 (Ohio Mun. Ct. 1979).

Subjective commendations of goods by the seller do not create warranties because the statements are merely the seller puffing its goods.  Hence, in Jordan v. Paccar, Inc., 37 F.3d 1181, 1185 (6th Cir. 1994), "rock-solid" and "strong" were subjective statements about a truck's fiberglass roof.  Statements that a car was "good on gas" and "performed fine" were likewise deemed to be puffery in Jackson v. Krieger Ford, Inc., No. 88AP-1030, 1989 Ohio App. LEXIS 1201, at *17 (10th Dist. Mar. 28, 1989) (noting that the terms "good" and "fine" were expressions of the seller's opinion).

38

"Effective" means "adequate to accomplish a purpose; producing the intended or expected result." Dictionary.com Unabridged (v 1.0.1), http://dictionary.reference.com/browse/ effective (last visited Oct. 20, 2006) (based on the Random House Unabridged Dictionary).  Understanding this, it is apparent that Rexius's statement concerning the trucks' dying feature asserts that the Express Blower trucks can dye mulch adequately and in the manner expected.  The Court determines that reasonable minds could only conclude that "effectively dye mulch" is an objective affirmation of fact, not sales puffery.

In this case, it appears that National Mulch was specifically interested in whether the EB-60 could dye mulch.  In response, Rexius allegedly told National Mulch that the EB-60 could effectively dye mulch.  Rexius clearly had superior knowledge in this regard, and National Mulch was justified in believing relying upon its representations.  Under these circumstances, this Court concludes that this representation became part of the basis of the bargain.  The statement that the EB-60 can "effectively dye mulch" therefore created an express warranty.

### iii.  Statements Regarding the Trucks' Quality

Finally, National Mulch alleges that Rexius made representations regarding the quality and reliability of the EB-60 trucks.  In particular, National Mulch alleges that Rexius represented, both in writing and orally, that the EB-60 was trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high-quality material and workmanship.  (Compl. ¶ 7; Fischer Decl. ¶ 6, Feb. 13, 2006.)  Additionally, National Mulch alleges that Rexius represented that the maintenance cost for the EB-60 was minimal.  (Compl. ¶ 7; Fischer Decl. ¶ 6, Feb. 13, 2006.)

As with the alleged representation that the trucks could effectively dye mulch, Rexius has not argued that it did not make these statements to National Mulch, either in writing or orally.  To

the contrary, Rexius concedes that its brochures contain these representations of quality. (Def.'s Mem. Supp. Mot. Partial Summ. J. Warr. Claims 11.) Despite Rexius's concession, the Court notes that most of the statements allegedly made by Rexius regarding the trucks' quality do not appear in its marketing literature submitted to the Court. The material does describe the Express Blower's feed system as "trouble-free." (Rexius Marketing Lit. 1.) However, nowhere in the brochures is any part of the Express Blowers expressly described as "of superior craftsmanship," "economical to operate," "built and manufactured with high-quality material and workmanship," or having "minimal maintenance cost." The only reference to the Express Blower's quality comes in the Operating Cost Analysis sheet discussed <u>supra</u>. There, Rexius provides estimated per cubic yard costs for "General maintenance" ($0.27/cu. yd.), "Tires" ($0.02/cu. yd.), and "Fuel" ($0.42/cu. yd.) based upon its actual experience.

Of course, an affirmation of fact that relates to the goods or a description of the goods does not need to be written to create an express warranty. National Mulch has asserted that these representations were made orally as well as in writing. (Fischer Decl. ¶ 6, Feb. 13, 2006.) Although there is an absence of evidence on the record to show that the quality statements, other than "trouble-free," were made in writing, Fischer's averment that these representations were made orally has not been contradicted by Rexius with any evidence.

Rexius argues that these statements of the Express Blowers' quality are puffery and therefore cannot form express warranties. Unlike <u>Barksdale</u>, there is no indication that the representations regarding quality were made in response to a specific inquiry by National Mulch or with knowledge of special needs on the part of National Mulch.

Nevertheless, Ohio courts have often found that representations of quality can create express warranties. For instance, in Jones, the court upheld the trial court's finding that a representation that an automobile was mechanically in "A-1 condition" created an express warranty. Jones, 5 Ohio App. 3d at 243. Similarly, in Abele, the court found that a representation that a boat was "unsurpassed for trouble-free operation" could create an express warranty. Abele, 11 F. Supp. 2d at 964 (denying summary judgment in favor of the defendant). Neither court, however, found that these statements created express warranties as a matter of law.

Again, the determination depends on whether the representation is an objective affirmation of fact or merely the seller's opinion. Similar to the statements regarding quality in Jones and Abele, "trouble-free," "economical to operate," and "minimal maintenance cost" seem to be objective statements of the Express Blowers' level of reliability and cost of operation. However, the Court concludes that neither party is entitled to summary judgment regarding these three alleged statements. Viewing the facts most favorably to Rexius, a reasonable jury could conclude that these statements are nothing more than Rexius's opinion of the goods. Thus, National Mulch is not entitled to summary judgment on the issue of whether these three statements created an express warranty. Likewise, with the facts viewed in favor of National Mulch, reasonable minds could determine that these three statements were either affirmations of fact relating to the goods or descriptions of the goods. As such, summary judgment on this issue in favor of Rexius would be inappropriate.

On the other hand, "superior craftsmanship" and "high-quality material and workmanship" cannot form express warranties under Ohio Revised Code § 1302.26. Neither statement is a description of the goods or an affirmation of fact that relates to the Express Blowers. Like the

41

statements at issue in <u>Jordan</u> and <u>Jackson</u>, these two statements are Rexius's commendation of its goods.  Both "superior" and "high-quality" are value judgments based upon the seller's opinion.  No reasonable jury, viewing the facts in the light most favorable to National Mulch, could conclude otherwise.  Therefore, Rexius is entitled to summary judgment on National Mulch's express warranty claims arising from these two statements.

### c.  Disclaimer

Rexius argues that, even if express warranties were created, those warranties were effectively disclaimed in the Sales Quote.  National Mulch argues that it cannot be bound by a disclaimer on the back of the Sales Quote that was not read by Fischer, who signed the Sales Quote on behalf of National Mulch.  National Mulch argues alternatively that the disclaimer found on the back of the Sales Quote was not adequate to disclaim the prior express warranties made by Rexius.

### i.  Validity of Disclaimer

National Mulch contends that it cannot be bound by language contained on the back of the Sales Quote because the record reflects that, while Fischer signed the front of the Sales Quote, he did not see the language referring to the back of the Sales Quote and, in any event, did not read the back of the Sales Quote.  (Fischer Decl. ¶ 40, Feb. 13, 2006.)  National Mulch therefore argues that the disclaimer did not become part of the parties' agreement.

Initially, this Court notes that National Mulch does not argue that Fischer lacked an opportunity to review the entire agreement prior to signing.  In support of its opposition to Rexius's motion for partial summary judgment, National Mulch cites <u>Dyno Construction Co. v. McWane, Inc.</u>, 198 F.3d 567 (6th Cir. 1999).  In <u>Dyno</u>, a purchaser of ductile iron pipe signed an agreement that was sent by fax.  <u>Id.</u> at 570-71.  However, the seller failed to fax the back side of the form,

which contained a limited liability clause.  Id.  Thus, a genuine issue of material fact existed

regarding whether the buyer had an opportunity to review the limited liability clause.  Id. at 570-75.

In this case, Fischer was present in Oregon on behalf of National Mulch and was given the

complete Sales Quote.  The following language appears directly beneath the signature line on the

Sales Quote:

> THIS AGREEMENT IS SUBJECT TO ALL TERMS AND CONDITIONS ON THE
> REVERSE SIDE INCLUDING THOSE WHICH **LIMIT WARRANTIES** AND
> THOSE WHICH AGREE TO A **GRANT OF SECURITY INTEREST**.  NOTE
> ALSO THE GEOGRAPHICAL USE LIMITATION DESCRIBED IN SECTION 13
> ON THE REVERSE SIDE.

(Sales Quote, Apr. 3, 2000.)  This language conspicuously notifies National Mulch that there are

additional terms and conditions on the reverse side and that warranties are limited.[21]  The back of

the Sales Quote provides a disclaimer which specifically states, in all capital letters,

> THERE ARE NO UNDERSTANDINGS , AGREEMENTS, REPRESENTATIONS
> OR WARRANTIES, EXPRESS OR IMPLIED OR STATUTORY, INCLUDING
> ANY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE
> OR OTHERWISE (EXCEPT AS TO TITLE).

(Id. at ¶ 7.)

As was recognized by the Supreme Court of Ohio,

> [a] person of ordinary mind cannot say that he was misled into signing a paper which
> was different from what he intended to sign when he could have known the truth by
> merely looking when he signed. . . . I[f] this were permitted, contracts would not be
> worth the paper on which they are written.  If a person can read and is not prevented

---

[21] Ohio Revised Code § 1301.01(J) states that:

a term or clause is "conspicuous" when it is so written that a reasonable person
against whom it is to operate ought to have noticed it.  A printed heading in capitals
(as: NONNEGOTIABLE BILL OF LADING) is "conspicuous."  Language in the
body of a form is "conspicuous" if it is in larger or other contrasting type or
color . . . .  Whether a term or clause is "conspicuous" is for decision by the court.

from reading what he signs, he alone is responsible for his omission to read what he signs.

Dice v. Akron, Canton & Youngstown R.R., 155 Ohio St. 185, 191 (1952), rev'd on other grounds, 342 U.S. 359 (1952); see also Provident Bank v. Adriatic, Inc., No. CA2004-12-108, 2005 WL 2840741, at *3 (Ohio App. 12th Dist. Oct. 31, 2005).

National Mulch notes that it did not initial the back of the Sales Quote. It suggests that this indicates that it did not assent to the terms and conditions contained on the back of the Sales Quote. However, upon review, it appears that the box for initialing found on the back of the Sales Quote pertains exclusively to paragraph 13, the geographical use limitation. Thus, this Court cannot conclude that the absence of initials on the back of the Sales Quote has any effect on the terms and conditions of the agreement.[22]

Even with all of the facts viewed in favor of National Mulch, a reasonable jury could only conclude that when Fischer signed the Sales Quote, National Mulch assented to all of the terms of the document, including those on the reverse side. The Court therefore determines that the disclaimer contained on the back of the Sales Quote became part of the parties' agreement.

### ii. Adequacy of Disclaimer

National Mulch argues that, even if the disclaimer became part of the parties' agreement, the disclaimer is not adequate to disclaim the express warranties created by Rexius. The U.C.C. specifically provides for the exclusion of warranties under certain circumstances:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of section 1302.05 of the

---

[22] Except of course paragraph 13, which is not relevant to this case.

44

Revised Code on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

Ohio Rev. Code § 1302.29(A).

As has been recognized, "express warranties are difficult to disclaim since they usually go to the essence of the bargain and form the basis of the agreement between the parties." Ohio Savings Bank, 54 Ohio App. 3d at 72 (citations omitted); see also Ohio Rev. Code § 1302.26 off. cmts. 1, 4. Disclaimers of express warranties are valid only to the extent that they are reasonably consistent with the warranties expressed. Thus, where the conflict is between a written disclaimer and other assertions which are part of the contract, the disclaimer is typically ineffective.

Ohio courts have addressed similar cases in which a pre-contractual oral representation conflicted with a disclaimer found in a subsequent written agreement. For example, in Barksdale, the seller of an automobile made pre-contractual oral representations that the transmission was in good working order. The parties then signed a written agreement stating that the automobile was sold "as is-no warranty." The court concluded that

> [w]hen a written contract for the sale of goods provides that the goods are sold "as is" and also disclaims all express and/or implied warranties and such provisions cannot be reasonably construed as consistent with the seller's oral express warranty, the express warranty will prevail and the inconsistent provisions deemed inoperative to the extent they are unreasonable.

Barksdale, 62 Ohio App. 3d at 729. A similar result was reached by the court in Pemberton, 63 Ohio Misc. at 29, 409 N.E.2d at 1076.

Rexius argues that although an unreasonable disclaimer is inoperative to negate express warranties contained in the same document as the disclaimer, such a disclaimer can still operate to disclaim warranties expressed in prior advertisements. In support of its position, Rexius cites Burton v. Elsea, Inc., No. 97CA2556, 1999 WL 1285874 (Ohio App. 4th Dist. Dec. 27, 1999). In Burton,

45

the court found that "negation language found within a[n] unambiguous written contract intended as the final expression of the parties' agreement, to the extent consistent with the rest of the written agreement, will operate even if the parties reached a prior oral agreement that included an express warranty." Id. at *6. However, in this case, as was discussed supra, the evidence does not support a conclusion that the Sales Quote constitutes the final statement of the terms of the parties' agreement and, therefore, the parol evidence rule does not apply.

Rexius next argues that cases cited by National Mulch invalidating disclaimers are distinguishable on their facts as they involve consumers and "extreme facts." According to Rexius, enforcement of the disclaimer in this case would not be unreasonable because, unlike the cases cited by National Mulch, this case involves sophisticated business entities and there is no evidence of the seller taking advantage of the buyer. Alternatively, Rexius argues that summary judgment in favor of National Mulch on this issue would be inappropriate because there are no facts indicating that enforcement of the disclaimer would be unreasonable.

Rexius's argument misses the point. The question to be answered under § 1302.29(A) is not whether enforcement of the disclaimer would be reasonable. Section 1302.29(A) clearly states that disclaimers are inoperative when their construction with express warranties is unreasonable. Thus, whether the parties to the contract are consumers or commercial entities is not determinative of whether a disclaimer is reasonable. Instead, the focus is on the "[w]ords or conduct relevant to the creation of an express warranty and the words or conduct tending to negate or limit [that] warranty." Ohio Rev. Code § 1302.29(A).

In this case, the statements alleged to create express warranties are directly contradicted by the language of the disclaimer on the back of the Sales Quote. No reasonable person could construe

46

the two as consistent with each other.  The Court concludes that allowing the written disclaimer of express warranties contained on the back of the Sales Quote to effect a waiver of the alleged express warranties made by Rexius prior thereto would be unreasonable.  Therefore, the disclaimer of express warranties found in the Sales Quote is ineffective to disclaim express warranties related to the EB-60's productivity, reliability, and ability to effectively dye mulch.

### d. Breach of Warranty

Finally, Rexius argues that it is entitled to summary judgment on National Mulch's express warranty claims based on the productivity statements because the facts show that Rexius did not breach those warranties.  Specifically, Rexius states that the Express Blowers are able to be operated by just one person and can blow mulch at the rate represented to National Mulch.

Rexius finds support for its contention that the Express Blowers could be operated by one person from the testimony of Renn Beal, a former employee of National Mulch.  During his deposition, Beal indicated that he was able to operate the truck by himself.  (Beal Dep. 44.)  National Mulch does not refute Beal's testimony; instead, it argues that the pertinent question is whether one person could be effectively operated by one person <u>and</u> apply most material at 55 cubic yards per hour.

In its Complaint, National Mulch alleges that Rexius breached two separate express warranties concerning the Express Blowers' productivity.  The first is that the trucks could blow 55 cubic yards per hour using only one person.  The second is that the trucks could be used effectively

by only one person.  Beal's testimony is directly relevant to the second of these alleged express warranties.[23]

Viewing the evidence in favor of National Mulch, the Court cannot say that reasonable minds could come to only one conclusion as to whether Rexius breached the alleged warranty that the trucks could be effectively used by only one person.  The small excerpt of Beal's deposition on the record does not show that, as a matter of law, the trucks could be used effectively by only one person.[24]  Other evidence shows that effective one-person operation might not have been possible.  For instance, Fischer testified that he observed an operator being "totally worn out" after operating the blower by himself for about fifteen minutes.  (Fischer Dep. 147.)  Rexius is not entitled to summary judgment on the issue of whether it breached the alleged express warranty that the Express Blowers could be effectively operated by one person.

Rexius also argues that there is no genuine issue as to whether it breached the alleged warranty regarding the Express Blowers' throughput rate.  It again relies upon Beal's testimony to support this assertion.  Beal testified that he could blow a payload of 60 cubic yards of playground chips in "an hour, an hour and 15 minutes."  (Beal Dep. 35.)  Rexius also argues that it is entitled to summary judgment on this claim because National Mulch admitted that the Express Blowers

---

[23] Beal did not state the throughput rate at which he was able to operate the Express Blower by himself.

[24] The Rexius marketing literature on the record does not actually use the term "effectively" in describing how the trucks can be used by only one person.  Nonetheless, it seems that the brochure affirms that one person can effectively operate the trucks.  It states that "the entire truck/blowing system is operated by just one person with remote control!  When the operator is ready to begin blowing, he simply picks up the end of the hose, turns the system on by remote control, and adjusts the flow of material to meet his needs as he moves from area to area."  (Rexius Marketing Lit. 3.)  Later, the brochure states that a "one-person crew can get large jobs done quickly."  (Id. at 4.)

"were able to meet the represented production levels where the nature of the materials and the layout of the job made material application easy."  (Fischer Decl. ¶ 19, Feb. 13, 2006.)

The Court agrees with Rexius that there is no genuine issue of fact regarding the question of whether the Express Blowers could blow 55 cubic yards per hour.  However, National Mulch has specifically argued that the express warranty created by Rexius in regards to throughput is that the Express Blowers, operated by one person, can blow 55 cubic yards per hour with <u>most material</u>. Rexius's marketing literature clearly makes this statement.  (Rexius Marketing Lit.  2.)  Thus, Rexius is only entitled to summary judgment on the issue of breach of this alleged express warranty if there is no genuine issue of fact as to whether the Express Blowers could perform as National Mulch alleges that they were represented.

The evidence advanced by Rexius does not show that it is entitled to summary judgment on this issue.  First, the Court notes that Beal's testimony is ambiguous as to whether he was able to blow mulch at 55 cubic yards per hour.  His testimony was that it took him about an hour to an hour and fifteen minutes to blow 60 cubic yards.  This equates to a throughput of somewhere between 48 and 60 cubic yards per hour.  Thus, contrary to Rexius's assertion, Beal's testimony does not definitely show that the Express Blowers could achieve 55 cubic yards per hour.

More importantly, Beal did not testify about his experience with "most material."  His testimony concerned only one material–playground chips.  Even if Beal's testimony did indicate unequivocally that he was able to get 55 cubic yards or more per hour blowing playground chips, it does not show that the Express Blowers could blow 55 cubic yards per hour with most material.

Additionally, National Mulch has put forth evidence to show that one person could not blow most material at 55 cubic yards per hour.  Fischer states that achieving the 55 cubic yard per hour

49

throughput was the "exception," possible only with limited materials.  (Fischer Decl. ¶ 19, Feb. 13, 2006.)  He also testified that one person could not physically operate the Express Blower for an extended time with the throughput increased to its maximum.  (Fischer Dep. 147-48.)

Given the evidence on the record, Rexius has not met its burden of showing that there is no genuine issue of fact regarding whether it breached the alleged warranty that the Express Blowers could, with one person, blow 55 cubic yards per hour with most material.  Therefore, Rexius is not entitled to summary judgment.

### 2. Implied Warranties

In Counts III and IV of the Complaint, National Mulch alleges that Rexius breached an implied warranty of merchantability and an implied warranty of fitness for a particular purpose, respectively.  In moving for partial summary judgment, Rexius argues that the Sales Quote disclaims all implied warranties.  National Mulch generally challenges the validity of the Sales Quote.

As was discussed supra, this Court concludes that the disclaimer found on the back of the Sales Quote became part of the agreement between the parties.  Therefore, the only question is whether the disclaimer effectively disclaimed all implied warranties.

With respect to the disclaimer of implied warranties, the Ohio Revised Code provides that:

> Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.  Language to exclude all implied warranties of fitness is sufficient if it states for example, that "There are no warranties which extend beyond the description on the face hereof."

Ohio Rev. Code § 1302.29(B).  Courts generally uphold a disclaimer of an implied warranty that complies with § 1302.29 between parties who have equal bargaining power.  See Ressallat v. Burglar & Fire Alarms, Inc., 79 Ohio App. 3d 43, 51 (1992).

50

As was noted <u>supra</u>, the front page of the Sales Quote, directly below the signature line, contains a clause indicating that there are additional terms and conditions, including terms limiting warranties, contained on the back of the Sales Quote.  The disclaimer on the reverse side conspicuously states that no implied warranties, including any implied warranties of merchantability and fitness for a particular purpose, have been made.[25]  National Mulch offers no argument as to why this language would be ineffective to disclaim all implied warranties.  This Court concludes that Rexius effectively disclaimed any implied warranty of merchantability or fitness for a particular purpose.  Rexius, therefore, is granted summary judgment on Counts III and IV of the Complaint.

**E. Damages**

Finally, Rexius has filed a motion for partial summary judgment with respect to National Mulch's request for damages.  In particular, Rexius argues that the Sales Quote excludes all consequential and incidental damages and that, under the U.C.C., National Mulch is limited to the difference in value between the EB-60 trucks that they received, and the value of those trucks as warranted.  Rexius also moves for summary judgment as to certain damages that National Mulch indicated in its initial disclosure.

The Court begins with the general position that the remedies provided under Chapter 1302 of the Ohio Revised Code are to be liberally administered for the purpose of putting a party aggrieved by a breach of contract or warranty in as good a position as if the other party had fully performed.  Ohio Rev. Code § 1301.06(A); <u>see also</u> <u>St. Henry Tile Co. v. Cain</u>, No. 1371, 1995 WL 783603, at * 2 (Ohio App. 2d Dist. Dec. 20, 1995).  The Ohio Revised Code provides the following measure of damages for accepted goods:

---

[25] As was noted <u>supra</u>, note 21, a printed heading in capitals is conspicuous.

> (A)     Where the buyer has accepted goods and given notification as provided in division (C) of section 1302.65 of the Revised Code, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (B)     The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (C)     In a proper case any incidental and consequential damages under section 1302.89 of the Revised Code may also be recovered.

§ 1302.88.  Subsections (A) and (B) are used to determine direct damages, while subsection (C) makes clear that separate, indirect damages are recoverable under § 1302.89.  That section dictates what damages the buyer can recover as incidental and consequential damages.  It states:

> (A)     Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (B)     Consequential damages resulting from the seller's breach include:
>
> > (1)     any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> >
> > (2)     injury to person or property proximately resulting from any breach of warranty.

§ 1302.89.

A buyer's consequential damages frequently include profits lost as a result of the seller's breach.  E.g., Cyclops Corp. v. Home Ins. Co., 389 F. Supp. 476, 478-79 (W.D. Pa. 1975) (applying Ohio law); Chemtrol, 42 Ohio St. 3d at 44.  Additional expenses incurred by the buyer resulting

from the seller's breach, such as increased costs of repairs and labor, are also recoverable as consequential damages under § 1302.89.  E.g., World Metals, Inc. v. AGA Gas, Inc.,142 Ohio App. 3d 283, 289 (2001).

### 1.  Limitation of Remedy for Breach of Contract

While the U.C.C. provides a remedy for consequential damages, it also allows the parties to agree to limit the buyer's remedy.  Section 1302.93(A)(1) states that "[t]he agreement may provide for remedies in addition to or in substitution for those provided [under the Code] and may limit or alter the measure of damages recoverable."  Under this section, parties to a contract may agree to exclude incidental and consequential damages from the amount recoverable flowing from a breach.

This Court concluded supra that the parties' agreement included the first twelve of the thirteen terms on the reverse side of the Sales Quote.  Paragraph 2 of the Sales Quote states: "Seller shall not be liable for . . . any incidental or consequential damages caused by or related to the goods sold . . . ."  By its plain language, this term limits the buyer's ability to recover incidental or consequential damages resulting from the seller's breach of the contract.  Unless unenforceable as a matter of law, the parties' agreement excludes incidental and consequential damages from any amount National Mulch may recover for any breach of warranty by Rexius.

A term of an agreement to limit or exclude consequential damages will not limit a party's recovery if enforcement of the term is unconscionable.  § 1302.93(C).  However, "limitation of damages where the loss is commercial is not" prima facie unconscionable.  Id.; accord Stevens v. Protecto Auto Care, Inc., No CA-8607, 1991 Ohio App. LEXIS 6353, at *8 (5th Dist. Dec. 30, 1991); Slemmons v. Ciba-Geigy Corp., 57 Ohio App. 2d 43, 57 (1978).  All of the losses that National Mulch alleges resulted from Rexius's breach of warranty are economic, i.e., commercial

losses.  In certain cases, enforcing the parties' agreement to exclude lost profits and increased business expenses from any recovery of damages could be unconscionable.  However, there are no circumstances in this case to support such a conclusion.  If the sellers of goods were not permitted to routinely exclude lost profits and increased expenses in their contracts, they would be forced to face nearly endless liability with each sale.  Such a result is contrary to the rationale behind § 1302.93.  Therefore, the Court determines that the term in the Sales Quote limiting recovery by excluding consequential damages is not unconscionable.

National Mulch contends that the limited remedy available to it under the terms of paragraph 2 fails of its essential purpose and that, as a result, it is not precluded from recovering incidental and consequential damages.  This argument lacks merit.

"Where circumstances cause an exclusive or limited remedy to fail of its essential purpose" damages that are normally available to the non-breaching party may be recovered.  § 1302.93(B).  A limited remedy fails of its essential purpose when the aggrieved party cannot obtain the intended benefit of the remedy for which it bargained.  See Abele, 11 F. Supp. 2d at 960-61; Cyclops, 389 F. Supp. at 482-83.  This frequently occurs in the situation where the parties agree that the buyer's only remedy for the seller's breach of warranty is repair or replacement of the goods sold.  The purpose of these limited remedies is "to give the seller an opportunity to cure the defect" and to limit the seller's risk "by excluding direct and consequential damages."  Abele, 11 F. Supp. 2d at 960.  This type of limited remedy typically fails when evidence shows that the seller either refuses to repair or replace the goods or, despite attempting repair, the seller was not able to cure its breach.  See, e.g., id. at 960-61.

Unlike the buyers in the cases cited in support of its argument, National Mulch's remedy is not limited to repair or replacement of the goods sold. Instead, paragraph 2 of the Sales Quote provides that National Mulch may not recover incidental or consequential damages, but this term leaves available to National Mulch damages directly caused by any breach of warranty by Rexius. These direct damages are recoverable under § 1302.88(B). National Mulch has put forth no evidence to show that it cannot receive the benefit of this limited remedy for which it bargained. Therefore, the Court cannot conclude that the limited remedy of the parties' agreement fails of its essential purpose.

Because it is neither unconscionable nor fails of its essential purpose, paragraph 2 of the Sales Quote operates to exclude incidental and consequential damages from National Mulch's remedy for any breach of warranty by Rexius. Rexius is entitled to summary judgment on National Mulch's claims for incidental and consequential damages under Count I of the Complaint.[26]

## 2. Measure of Direct Damages for Breach of Warranty

Rexius has also moved for summary judgment on National Mulch's claim for lease payments that it made on the Rexius trucks and the remaining balance owed on the leases. In support, Rexius argues that the proper measure of direct damages for breach of warranty in this case is the difference between the value of the trucks when accepted and the value that they would have had if they had been delivered as warranted. According to Rexius, National Mulch's claim for all of its lease payments would allow it to recover an amount much greater than this difference. National Mulch

---

[26] Rexius argues in the alternative that National Mulch cannot recover startup and overhead costs that National Mulch claims as consequential damages because it would have incurred these costs irrespective of any breach by of warranty by Rexius. Because the Court concludes that the parties agreed to exclude consequential damages from any recovery for breach of warranty, there is no need to address this argument.

replies that it is not limited to the difference in value measure because the alleged breach of

warranties by Rexius caused National Mulch to suffer a complete business failure.

In a letter to Rexius dated April 28, 2005, National Mulch claimed as damages $370,567.02

in lease payments that it had made on the Rexius trucks and the $454.259.41 balance that it owes

on the lease.  (Damages Analysis Letter 2, Batson Decl. Ex. 3, R. at 75-2.)  These amounts include

both the principal and interest on the loan that National Mulch took to finance the trucks.[27]  (See

Fischer Dep. 185-87.)  The combined price that National Mulch paid for the two Rexius trucks was

$580,628.[28]  National Mulch sold the two trucks in December 2005 for approximately $320,000.

(Fischer Decl. ¶ 25, Feb. 13, 2006.)

Section 1302.88(B)'s difference in value measure for damages resulting from a breach of

warranty is the "usual, standard and reasonable method of ascertaining damages." Simons Cadillac,

Inc. v. Roddy, No. 9970, 1987 WL 6242, at *4 (Ohio App. 2nd Dist. Feb. 3, 1987).  However, a

different measure is proper when "special circumstances show proximate damages of a different

amount."  § 1302.88(B); accord, e.g., Simons Cadillac, 1987 WL 6242, at *4; Gen. Motors

Acceptance Corp. v. Grady, 27 Ohio App. 3d 321, 325 (1985).  In Simons Cadillac, special

circumstances existed because the difference in market value measure would not have resulted in

---

[27] National Mulch is correct in its assertion that a buyer can recover interest payments used to finance the purchase the goods that are the subject of the seller's alleged breach of warranty.  See, e.g., Bobb Forest Prods., Inc. v. Morbark Indus., Inc., 181 Ohio App. 3d 63, 87-88 (2002).  However, financing costs are consequential damages, id.; Architectural Identification, Inc. v. Am. Bus. Equip., No. 85 AP-1048, 1986 WL 309, at * 4 (Ohio App. 10th Dist. Sept. 16, 1986), and are therefore not available as damages for any breach of warranty in this case because the parties excluded consequential damages from any recovery.  See supra.

[28] According to the April 3, 2000 Sales Quote, the first truck was sold to National Mulch for $291,933.  The April 28, 2000 Sales Quote indicates that the second truck was sold for $288,695.

an accurate determination of the buyer's proximate damages.  <u>Simons Cadillac</u>, 1987 WL 6242, at

*4 ($9700 difference in market value was not the proper measure of damages where buyer only

incurred actual costs of $6,836 to remedy the seller's breach of title warranty.  The difference in

market value measure would have put the buyer in a better position then if there had been no

breach).  In <u>Grady</u>, the difference in market value measure was not used to determine damages

because, although the buyer had accepted delivery of a car that she had purchased, the car was later

repossessed.  <u>Grady</u>, 27 Ohio App. 3d at 325.

   National Mulch asserts that its business failure is a special circumstance that allows it to

recover the entire price of the trucks and the cost of financing them.  It argues that, like the buyers

in <u>Simons Cadillac</u> and <u>Grady</u>, the difference in market value measure for damages will not make

it whole.  The Court disagrees.  There is no evidence to suggest that the difference in market value

measure for damages in § 1302.88(B) will not result in an accurate determination of National

Mulch's proximate damages from any breach of warranty by Rexius.  To the contrary, allowing

National Mulch to recover the entire purchase price of the trucks plus financing costs ($824,826.43

according to National Mulch) as <u>direct</u> damages would put it in a better position than if the alleged

breach of warranty never occurred.[29]

   National Mulch argues at length that <u>Dynamic Recycling Services, Inc. v. Shred Pax Corp.</u>,

210 Ill. App. 3d 602 (1991), supports a damages award of the entire purchase price of the trucks.

Like National Mulch, the buyer in that case argued that the seller's breach of warranty resulted in

---

[29] With a recovery of the $824,826.43 in damages claimed as the price of the trucks and
financing charges, National Mulch would receive in damages $244,198.43 more than it paid for
the trucks.  Together with the $320,000 that it received upon the sale of the trucks, National
Mulch's total windfall would be $564,198.43 <u>plus</u> the value of possessing the trucks between
spring 2000 and the end of 2005.

the failure of its business.  Id. at 607.  The court in Dynamic relied upon the special circumstances

exception in the Illinois equivalent to § 1302.88(B) when it affirmed the trial court's damage award

of the entire amount paid for the goods.  Id. at 615-16.  Although the goods as accepted had value

at the time of acceptance, the buyer went out of business due in part to the seller's breach, making

the goods worthless.  Id. at 615.  The court stated that the difference in market value at the time of

acceptance between the goods accepted and the value they would have had if they had been as

warranted would not make the buyer whole in these special circumstances.  Id.

The Court does not find Dynamic persuasive.  First, the buyer in that case attempted to

revoke its acceptance within two months of delivery of the goods.[30]  Id. at 606.  By contrast,

National Mulch never revoked, or even attempted to revoke, its acceptance of the trucks.  Instead,

it used the trucks for several years.  More importantly, unlike the goods in Dynamic that were

worthless after the buyer's business failed, it is indisputable that the Rexius trucks retained immense

value even after National Mulch closed its doors.  Thus, this case is distinguishable from Dynamic

and cases where the full price of the goods are awarded as damages because the goods as accepted

by the buyer had no value.  E.g., Vitek v. Baker, No. 86AP-865, 1987 Ohio App. LEXIS 7794, at

*6-7 (10th Dist. June 30, 1987) (difference between value of goods accepted and value that they

would have had if they had been as warranted was the contract price because the goods as accepted

were worthless).

Viewing the evidence most favorably to National Mulch, the Court concludes there is no

genuine issue for trial regarding the existence of special circumstances that would dictate a measure

---

[30] Under Ohio Revised Code § 1302.85, a buyer who justifiably revokes acceptance may
recover the entire price that it has paid for the goods.

of damages other than that called for in § 1302.88(B).  Instead, reasonable minds could only conclude that National Mulch's direct damages for any breach of warranty by Rexius are appropriately measured by the difference at the time of acceptance between the value of the trucks as accepted and the value they would have had if they had been as warranted.  Therefore, the Court determines that direct damages for breach of warranty in excess of § 1302.88(B)'s difference in value measure are unavailable to National Mulch as a matter of law.

### 3. Damages Claimed in National Mulch's Initial Disclosure

Last, Rexius moves the Court for summary judgment on certain categories of damages included in National Mulch's initial computation of damages.  In its initial disclosures, National Mulch listed the following as direct and consequential damages:

| | | |
|---|---|---|
| a. | Outstanding line of credit (including expenditure for parts and labor and lost utility) | $397,129.00 |
| b. | Balance of leases for vehicles | $550,000.00 |
| c. | Outstanding Shareholder loans to company | $232,429,75 |
| d. | Twenty percent margin of total sales lost profit | $430,931.68 |
| e. | Outstanding salary obligations to Rick Fisher [sic] | $336,000.00 |
| f. | Outstanding salary obligations to Monte Will | $ 42,000.00 |
| g. | Outstanding office rent | $ 25,200.00 |
| h. | Outstanding bookkeeping/office support | $ 38,472.00 |
| i. | Outstanding office equipment liability | $ 12,600.00 |
| | Total Losses to Date | $2,064,767.00 |

(Pl.'s Initial Disclosures 7, Batson Decl. Ex. 1.)  Rexius asserts that it is entitled to summary judgment to the extent that National Mulch seeks damages on all of the above items, except for the balance of the leases on the trucks, because National Mulch has abandoned them.  Alternatively, Rexius argues that no genuine issue of fact exists as to whether these items are recoverable in this case.

National Mulch has twice updated its damages computation (See Batson Decl. Exs. 2-3.) While both updates include the balance that National Mulch owes on its leases for the trucks, neither includes as damages any of the other categories of damages included in National Mulch's initial disclosures. (See id.) Based upon this, Rexius argues that National Mulch has abandoned its claims for these categories of damages. In response, National Mulch concedes that it abandoned certain claims for damages after discovery commenced and that this is reflected in its updated damages analysis.

Whether the categories of damages for which Rexius seeks summary judgment are recoverable is no longer at issue in this case because National Mulch concedes that it has abandoned its claims for these categories. As such, Rexius's motion for summary judgment on these damages is denied as moot.

**IV.  Conclusion**

WHEREUPON, Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim (R. at 73) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim is **GRANTED** to the extent that the claim is based upon omissions of fact. Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim is otherwise **DENIED**.

National Mulch's motion for partial summary judgment on the issues of creation of express warranties and the disclaiming of warranties (R. at 87) is **GRANTED** in part and **DENIED** in part. National Mulch's motion for partial summary judgment on the issue of the creation of an express warranty that the Rexius Express Blowers could effectively dye mulch is **GRANTED**. National

Mulch's motion for partial summary judgment on the issue of the creation of all other express warranties is **DENIED**.  National Mulch's motion for partial summary judgment on the issue of whether Rexius effectively disclaimed express warranties is **GRANTED**.

Rexius's motion for partial summary judgment on National Mulch's warranty claims (R. at 88) is **GRANTED** in part and **DENIED** in part.  Rexius's motion for partial summary judgment on National Mulch's claim of breach of express warranty is **GRANTED** to the extent that the claim is based on statements that the Rexius Express Blowers are "of superior craftsmanship" and "built and manufactured with high quality material and workmanship."  Rexius's motion for partial summary judgment on National Mulch's claim of breach of express warranties is otherwise **DENIED**. Rexius's motion for partial summary judgment on National Mulch's claims of breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose is **GRANTED**.

Rexius's motion for partial summary judgment on certain damages claimed by National Mulch (R. at 75) is **GRANTED** in part and **DENIED** in part.  Rexius's motion for partial summary judgment on incidental and consequential damages resulting from any breach of warranty by Rexius is **GRANTED**.  Rexius's motion for partial summary judgment on the measure of direct damages resulting from any breach of warranty by Rexius is **GRANTED**.  Rexius's motion for partial summary judgment on certain categories of damages claimed by National Mulch in its initial disclosure is moot and is therefore **DENIED**.

61

Finally, Rexius's objection to certain evidence submitted by National Mulch (R. at 92) is moot and is therefore **OVERRULED**.


**IT IS SO ORDERED.**


Date:   <u>March 22, 2007</u>                              <u>**/s/ John D. Holschuh**</u>
                                                   John D. Holschuh, Judge
                                                   United States District Court